**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**KIMBERLY RUTH CARTER,**

      **Plaintiff,**

**vs.**                                                   **CIVIL ACTION NO. 2:17-CV-04399**

**NANCY A. BERRYHILL,
ACTING COMMISSIONER OF
SOCIAL SECURITY,**

      **Defendant.**

<u>**PROPOSED FINDINGS AND RECOMMENDATION**</u>

This is an action seeking review of the final decision of the Acting Commissioner of Social Security denying the Plaintiff's applications for Disability Insurance Benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. By Order entered November 28, 2017 (Document No. 3.), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's Memorandum in Support of Judgment on the Pleadings and Defendant's Brief in Support of Defendant's Decision. (Document Nos. 11 and 12.)

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the United States District Judge **GRANT** Plaintiff's request for judgment on the pleadings (Document No. 11.), **DENY** Defendant's request to affirm the decision of the Commissioner (Document No. 12.); **REVERSE** the final decision of the Commissioner; and **REMAND** this matter for the reasons stated *infra*.

<u>**Procedural History**</u>

The Plaintiff, Kimberly Ruth Carter, (hereinafter referred to as "Claimant"), protectively filed her application for Title II benefits on January 16, 2014, alleging disability since August 27, 2013, because of "seizures, cerebrovascular accident costovertebral-CVA, diabetes, high blood pressure, and high cholesterol".[1] (Tr. at 180-182, 183-184, 196.) Her claim was initially denied on April 10, 2014 (Tr. at 107-117.) and again upon reconsideration on October 28, 2014. (Tr. at 120-126.) Thereafter, Claimant filed a written request for hearing on December 1, 2014. (Tr. at 127-128.)

An administrative hearing was held on August 16, 2016 before the Honorable M. Drew Crislip, Administrative Law Judge ("ALJ"). (Tr. at 62-84.) On September 15, 2016, the ALJ entered an unfavorable decision. (Tr. at 44-61.) On November 14, 2016, Claimant sought review by the Appeals Council of the ALJ's decision. (Tr. at 178-179, 263-264.) The ALJ's decision became the final decision of the Commissioner on August 1, 2017 when the Appeals Council denied Claimant's Request. (Tr. at 6-12.)

On November 27, 2017, Claimant timely brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).[2] (Document No. 1.) The Commissioner filed an Answer and a Transcript of the Administrative Proceedings. (Document Nos. 7 and 8.) Subsequently, Claimant filed a Memorandum in Support of Judgment on the Pleadings (Document No. 11.), in response, the Commissioner filed a Brief in Support of Defendant's Decision (Document No. 12.), to which Claimant filed her Reply. (Document No. 13.) Consequently, this matter is fully briefed and ready for resolution.

---

[1] In her Disability Report – Appeal, submitted on April 29, 2014, Claimant alleged that she continued to have shortness of breath "even when sitting down" and "short term memory problems and concentration issues." (Tr. at 207.)
[2] On September 26, 2017, Claimant, by counsel, requested an extension of time to file the civil action (Tr. at 4-5.); the Appeals Council permitted a thirty day extension by notice dated November 3, 2017. (Tr. at 1-3.)

**Claimant's Background**

Claimant was 40 years old as of the alleged onset date and considered a "younger person" throughout the underlying proceedings. <u>See</u> 20 C.F.R. § 404.1563(c). (Tr. at 55.) Claimant left school after completing the eleventh grade.[3] (Tr. at 371, 425.) She worked as a hospital cook from 1991 to 2013. (Tr. at 197.)

**Standard**

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. <u>See</u> <u>Blalock v. Richardson</u>, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. § 404.1520. If an individual is found "not disabled" at any step, further inquiry is unnecessary. <u>Id</u>. § 404.1520(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. <u>Id</u>. § 404.1520(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. <u>Id</u>. § 404.1520(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. <u>Id</u>. § 404.1520(d). If it does, the claimant is found disabled and awarded benefits. <u>Id</u>. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant

---

[3] Claimant testified during the administrative hearing that she did not have a GED. (Tr. at 74.) The ALJ determined Claimant has a "limited education." (Tr. at 55.)

work. Id. § 404.1520(f). By satisfying inquiry four, the claimant establishes a *prima facie* case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).

The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. Id. § 404.1520(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

## Summary of ALJ's Decision

In this particular case, the ALJ determined that Claimant met the requirements for insured worker status through December 31, 2018. (Tr. at 49, Finding No. 1.) Moreover, the ALJ determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since the alleged onset date of August 27, 2013. (Id., Finding No. 2.) Under the second inquiry, the ALJ found that Claimant had the following severe impairment: seizure disorder. (Id., Finding No. 3.) At the third inquiry, the ALJ concluded Claimant's impairments did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 52, Finding No. 4.) The ALJ then found that Claimant had the residual functional capacity ("RFC") to perform medium work:

> except she is able to lift/carry and push/pull 50 pounds occasionally, 25 pounds frequently. She is able to climb ramps and stairs, balance, stoop, kneel, and crouch occasionally. She should never climb ladders, ropes, or scaffolds or crawl. The use of foot controls is limited to frequent. She is limited to occasional exposure to weather, humidity, wetness, extreme heat, and vibration. The claimant should avoid

4

all exposure to extreme cold, moving mechanical parts, unprotected heights, and very bright or flashing lights. She should never be expected to operate a motor vehicle. The noise level is limited to moderate. She is limited to the performance of simple, routine, repetitive tasks, but not at a production rate pace. She is limited to simple work related decisions. In addition to normal breaks, the claimant will be off task 15 percent of the time in an eight-hour workday.

(Tr. at 52-53, Finding No. 5.)

At step four, the ALJ found Claimant was unable to perform any past relevant work. (Tr. at 55, Finding No. 6.) At the final step, the ALJ found that based on Claimant's age, education, work experience, and RFC, and the immateriality of the transferability of job skills, other jobs existed in significant numbers in the national economy that she can perform. (Id., Finding Nos. 7-10.) Finally, the ALJ determined Claimant had not been under a disability from August 27, 2013 through the date of the decision. (Tr. at 56, Finding No. 11.)

**Claimant's Challenges to the Commissioner's Decision**

Claimant asserts the ALJ erred by failing to provide an adequate explanation for the RFC finding: specifically with respect to his determination that she would be off task 15 percent of the time. (Document No. 11 at 5-7.) Claimant argues that there is no medical evidence to support this determination, though hedges that the only reference to this 15 percent off task conduct stems from the vocational expert's responses to questioning by Claimant's attorney during the hearing. (Id. at 7.) To further complicate or compound this error, Claimant contends that despite the ALJ's finding her other medically determinable impairments non-severe at step two, he made references in his decision that undermine that finding, and further, the ALJ did not explain which of Claimant's impairments, singly or in combination, would cause her to be off task 15 percent of the workday. (Id. at 8.)

Due to these errors, Claimant asks for a remand in order for the Commissioner to correct

them. (Id. at 9.)

In response, the Commissioner asserts that the ALJ's RFC assessment provided a generous allowance that Claimant would be off task up to fifteen percent of the workday in addition to normal breaks to accommodate her testimony that her pancreatoduodenectomy caused her to have twenty bowel movements per day – despite no treatment notes reflecting this frequency. (Document No. 12 at 13-14.) In addition, the ALJ reviewed Claimant's medical records, her own reports, and the consultative examination findings in support of his RFC determination that she would be off task only fifteen percent of a workday. (Id. at 13-15.) Further, the Commissioner argues that Claimant does not address any evidence would support a greater limitation than what the ALJ found. (Id. at 15.) The Regulations do not require an ALJ to specifically match each assessed functional limitation to a corresponding impairment. (Id. at 15-16.) Claimant's assertions otherwise is a form over substance argument that the Fourth Circuit does not endorse; an ALJ must provide sufficient development of the record and explanation for his conclusions that allow for meaningful review. (Id. at 16.)

Moreover, the ALJ was not required to rely upon a medical opinion in his assessment that Claimant would be off task fifteen percent of the workday; the RFC assessment is for the ALJ alone to determine. (Id. at 17.) In this case, the ALJ assessed Claimant's RFC to accommodate more functional limitations than those opined by the physicians of record, including Claimant's treating neurologist. (Id.)

Next, the Commissioner states that the ALJ was not required to adopt the vocational expert's responses that do not coincide with the limitations adopted by the ALJ; the ALJ herein is the fact-finder and determined that based on the evidence of record, Claimant could be expected

to be off task fifteen percent of the time, but no more. (Id. at 18-19.)

With respect to the ALJ's finding that Claimant's other medically determinable impairments were non-severe, the Commissioner states that no error was committed at step two, and that he appropriately followed the Regulations in including all of Claimant's credibly-established limitations, from both her severe and non-severe impairments, in assessing the RFC. (Id. at 19-20.)

Finally, the Commissioner asserts that substantial evidence supported the ALJ's decision, and should be affirmed. (Id. at 20.)

Claimant replies that the Commissioner's argument that the ALJ explained how he came up with the fifteen percent off task behavior is *post hoc*, and the law is clear that in order for meaningful review, the ALJ had to explain his RFC limitation findings. (Document No. 13 at 1-2.) Claimant points out that in both Lanigan v. Berryhill, 865 F.3d 558 (7th Cir. 2017) and Olivarez v. Colvin, No. 12-cv-884-wmc, 2015 WL 1506084 (W.D. Wis. April 1, 2015), the courts remanded because the ALJs therein failed to explain the off task limitation in their RFC findings. (Id. at 2-3.) Because the same errors noted in Lanigan and Olivarez occurred here, this case must be remanded. (Id. at 3.) Since the decision below is not supported by substantial evidence, Claimant asks her case be remanded for the correction of these errors. (Id. at 4.)

**The Relevant Evidence of Record**[4]

The undersigned has considered all evidence of record pertaining to Claimant's arguments and discusses it below.

Medical Evidence Related to Claimant's Severe Impairment – Seizure Disorder:

---

[4] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings.

On August 27, 2013, Claimant was admitted at the Charleston Area Medical Center for a possible seizure. (Tr. at 268-270.) During her three-day hospitalization, records show that Claimant had no history of seizure or head trauma. (Tr. at 279.) She had a normal neurological examination; was alert and oriented to person, place and time; demonstrated equal strength; had no focal deficits and no facial asymmetry; and had intact cranial nerves, though she seemed somewhat postictal. (Tr. at 273.) An EEG was within normal limits; a CT of her brain showed no hemorrhage or hydrocephalous; and a Willis MR angiogram showed no evidence of stenosis, obstruction, or aneurism. (Tr. at 266, 298, 302, 438, 443, 451, 454.) An MRI of the head and neck showed a 3cm segment of paraform enhancement involving only the superficial gray matter in the posterolateral frontal vertex, frontoparetial vertex. (Tr. at 279, 299-300.) A follow-up study was recommended. (Tr. at 279.)

Claimant followed up with neurologist Joby Joseph, M.D., on September 4, 2013 for an initial evaluation for seizure and an abnormal MRI. (Tr. at 335-337.) Dr. Joseph noted that she had a normal mood and affect; was oriented to person, place, and time; had spontaneous stream of thought; intact abstract thought; intact serial 3s, intact simple calculations; intact immediate, recent, and remote memory; good attention span and concentration; and a normal cerebellar examination. (Tr. at 337.) Dr. Joseph recommended that Claimant obtain another MRI, and that she should not drive until she was seizure free, and perform no work at heights, near fire, or with heavy machinery, and not go swimming or take baths. (Id.) On September 10, 2013, Claimant followed up with her primary care physician, Lester Labus, M.D., who noted that she was grossly oriented to person, place, and time, and advised her to have a repeat MRI. (Tr. at 338.)

A follow-up MRI on September 18, 2013 showed a persistent gyriform enhancement

overlying the posterior aspect of the right frontal lobe that improved when compared with the previous study of August 28, 2013; no new areas of abnormal enhancement; and a differential diagnosis including changes of subacute and cortical infarction versus residual of a focal or infections such as meningitis. (Tr. at 334.)

Claimant followed up with Dr. Joseph on October 3, 2013, noting that she had no further seizures. (Tr. at 406.) She indicated that her left sided weakness was better, but she still reported short-term memory problems. (Id.) Her neurological examination was unchanged; she was alert and oriented; had intact cranial nerves; but was unable to tandem walk. (Tr. at 407.)

On November 11, 2013, Claimant underwent a vascular neurology consult with Dolora R. Wisco, M.D., of the Cleveland Clinic, where she complained of short-term memory loss and right arm tremors. (Tr. at 348.) However, on examination, Claimant was alert, oriented to person, place, and time and was able to follow commands. (Tr. at 350.) Cranial nerve testing was normal; she had intact fascial sensation and no droop or ptosis, no dysarthria, no pronator drift; displayed normal tone and strength; had normal finger-nose-finger and heel-shin testing; and walked with a normal gait. (Tr. at 350-351.) Dr. Wisco noted that it was likely she had a stroke with secondary seizure, but could not rule out a low-grade glioma. (Tr. at 351.)

At a follow up with Dr. Wisco a few months later in February 2014, Claimant continued to complain of short-term memory problems, though on examination Claimant was alert and oriented; able to follow commands; had normal gait; intact sensation; and intact finger-nose- finger and heel-shin testing. (Tr. at 360.) Dr. Wisco did not think that Claimant could go back to work as a hospital cook. (Tr. at 361.) That month, Claimant also followed up with Dr. Joseph, who likewise noted that she was alert and oriented; had intact cranial nerves; unremarkable motor, sensory, and

cerebellar examinations; and normal gait. (Tr. at 411.) He again instructed Claimant not to drive or engage in activities that could endanger life. (Id.)

On May 21, 2014, at the request of Dr. Wisco, Claimant underwent a neuropsychological examination with Richard I. Naugle, Ph.D. due to her complaints of short-term memory loss. (Tr. at 369.) On examination, Claimant was alert, attentive, pleasant, and cooperative; had some problems with word finding but was able to express herself; and generally understood instructions and tolerated frustration in response to more demanding tasks. (Tr. at 371.) Based on the administered testing, Dr. Naugle determined that Claimant had difficulties in areas of flexible thinking/problem solving, confrontation naming, and verbal rote learning, though her delayed free recall and delayed recognition of stimuli was low average. (Tr. at 372.) Dr. Naugle categorized the remainder of her neuropsychological profile as unremarkable, ranging from low average to average. (Id.) He also noted that it was noteworthy that Claimant's immediate and delayed recall of paragraphs and visuospatial details was average, and that she retained 91-100 percent of those details she could initially remember. (Id.)

Dr. Naugle believed Claimant's memory lapses were likely attributed to problems with executive functioning rather than memory compromise *per se*; he believed the etiology was potentially multifactorial. (Id.) While the possibility of lapses as a result of the frontal lesion could not be ruled out, he also noted that Claimant's blood glucose[5] was poorly controlled, that she acknowledged poor sleep, and that in her questionnaire, she noted depression, which could also contribute to or even account for Claimant's executive dysfunction. (Tr. at 372-373.) He

---

[5] Claimant treated with Samar Sankari, M.D., for diabetes on three occasions during the relevant period. (Tr. at 306-309.) She admitted to not checking blood sugar or was not checking it consistently (Tr. at 308-309.), was not really counting carbs (Tr. at 308.), forgot to keep a blood sugar diary (Tr. at 307.), and was not always taking medication as instructed. (Tr. at 308-309.)

recommended that she control her blood glucose, obtain a polysomnogram if she was unable to restore restful sleep, and encouraged a psychological consultation. (Tr. at 373.)

Claimant followed up with Dr. Joseph on July 9, 2014, at which time he noted that her neurological examination was unchanged from the last visit, and advised her to return in six months. (Tr. at 413.) Later, on July 31, 2014, Claimant followed up with Dr. Wisco, who obtained a brain MRI and advised her to start Prozac and follow up with a local psychiatrist and psychologist. (Tr. 794-795, 807.) On examination, Claimant was awake and alert, had fluent speech, no dysarthria, full orientation, and good attention and insight into her illness. (Tr. at 805.) She had not had any break through seizures, and was now driving short distances. (Tr. at 804.) Dr. Wisco advised Claimant to discontinue smoking, continue her meds, and repeat her MRI. (Tr. at 806.)

Claimant did not receive additional neurological treatment for one year, when she returned to Dr. Joseph in the summer of 2015. (Tr. at 641.) Her neurological examination remained unchanged, and he advised Claimant to wean off Prozac. (Id.) An MRI around this time showed increased encephalomalacia surround the remote right frontal infract, but no acute abnormality was identified. (Tr. at 484.) When she returned to Dr. Joseph in November 2015, Claimant reported that she had not had any seizures, though she still reported some impairment of memory. (Tr. at 642.) Her neurological examination remained unchanged, she was alert and oriented; had intact cranial nerves; unchanged motor, sensory, and cerebellar examinations; but was unable to perform tandem walking. (Tr. at 643.) He advised Claimant to repeat an MRI in 6 months. (Id.)

When Claimant returned to Dr. Joseph in May 2016, she complained of dizziness, but admitted that she had no further seizures. (Tr. at 830.) On examination, Claimant was alert and

11

oriented; had intact cranial nerves; unremarkable motor, sensory, and cerebellar examinations; a normal gait and station; but a positive Romberg test. (Tr. at 831.) Dr. Joseph ordered an MRI. (Id.)

Claimant underwent an MRI of the brain in June 2016, which revealed no acute findings. (Tr. at 835.) At her June 2016 follow-up with Dr. Joseph, he noted that the MRI and carotid did not show any acute pathology. (Tr. at 847.) Her neurological examination was unchanged. (Tr. at 848.) He continued to advise Claimant to avoid working at heights, near fire, or with heavy machinery, and to take showers instead of baths and avoid swimming. (Id.)

Medical Records Related to Claimant's Non-Severe Impairment – Pancreatitis:

In April 2015, Claimant presented to Charleston Area Medical Center for complaints of upper quadrant gastric pain. (Tr. at 521-523.) A CT of the abdomen showed a 6 cm mass at the head of the pancreas with associated coarse calcifications highly concerning for pancreatic neoplasm, and atrophy of the body and tail of the pancreas. (Tr. at 522.) On May 15, 2015, Claimant underwent a Whipple procedure (or pancreatoduodenectomy) for chronic pancreatitis. (Tr. at 511.) By May 28, however, Claimant returned with complaints of abdominal pain (Tr. at 457.), and remained hospitalized for approximately one month due to complications including an abscess, septic shock and deep vein thrombosis. (Tr. at 470, 472, 505; see generally Tr. at 457-507.)

Claimant returned to both her primary care physician, Lester Labus, M.D., and to Charleston for complaints of pain in her stomach and increased swelling in her lower leg on a few occasions in early July 2015. (Tr. at 545, 706, 711, 725.) However, CT and x-rays of her abdomen showed no evidence of abscess or bowel obstruction, no acute cardiothoracic process, and non-obstructive bowel gas pattern. (Tr. at 712, 723.) Her left leg edema was classified as "mild" (Tr.

at 712.), ranging between 1+ and 2+ pitting edema. (Tr. at 547, 707, 730, 732.) Claimant was told to continue taking Coumadin, a blood thinner, and that her swelling could maintain for several months. (Tr. at 688.)

Claimant also underwent treatment at Charleston in late July and August 2015, with complaints of nausea, vomiting, and frequent bowel movements. (Tr. at 644, 665.) Again, an x-ray of the abdomen showed no acute cardiothoracic process and a non-obstructive gas pattern. (Tr. at 684.) On August 26, 2015, Claimant complained to Dr. Labus that she had intermittent abdominal pain with five to six bowel movements per day. (Tr. at 823.)

When Claimant returned to Dr. Labus in September, she complained of increased pain and swelling in her leg. (Tr. at 820.) Examination revealed 1+ edema in her left leg, and she was told to continue her anticoagulation medication, use moist heat, and elevate. (Tr. at 821.) By November, she still had swelling and pain in her left leg, but she was able to stand without difficulty and had a normal gait. (Tr. at 817.) Dr. Labus noted that overall she was much improved. (Id.)

In February 2016, Dr. Labus diagnosed Claimant with a ventral hernia following her pancreatoduodenectomy (Tr. at 813.) and Claimant underwent a hernia repair. (Tr. at 843-845.) A review of her extremities at that time revealed no edema. (Tr. at 841.)

Consultative Mental Status Examination:

On October 7, 2014, Claimant underwent a mental status examination with consultative examiner Angela Nulls, M.D. (Tr. at 423-429.) At this examination, Claimant reported that she goes to the store once per day and runs errands once per week; eats out three times per week; visits family and friends once per week; but generally does not talk on the telephone, shop at the mall, or exercise. (Tr. at 427.) She attends two movies per year, and she reads as a hobby. (Id.) She

attends medical appointments, but her husband generally manages the bills and finances. (Id.) Her daily routine includes performing all basic living duties independently, though she required prompts to take medication, and does housework if she is not alone. (Id.) Claimant reported that she is forgetful with laundry and cooking. (Id.) Claimant noted that on a typical day she gets her husband off to work, goes back to bed, lies around, watches television, reads, sits on the porch, eats three meals per day, and showers daily. (Id.)

On examination, Claimant was cooperative with the examiner and established direct eye contact; had logical, coherent, and spontaneous speech; was oriented to person, place, date and time; had only a mildly dysphoric mood and appropriate affect; displayed a generally connected thought process and no indication of obsessions, compulsions, paranoid ideation, or unusual perceptual experiences; displayed intact judgment and insight; had normal psychomotor behavior; and had intact immediate memory (recalling 4/4 words), moderately deficient recent memory (recalling 4/4 words with many prompts after a 5 minute day), and a mildly deficient remote memory (due to some difficulty recalling details of her personal history). (Tr. at 425-426.)

Claimant displayed mildly deficient concentration based on her ability to repeat digits; had normal pace; and varied persistence. (Tr. at 426.) Her social functioning was mildly deficient based on clinical observation of interactions with the examiner and others. (Id.) Dr. Nulls diagnosed cognitive disorder, not otherwise specified (provisional) and depressive disorder, not otherwise specified. (Tr. at 427.) The diagnosis of cognitive disorder was listed as provisional because no testing was requested or completed. (Tr. at 426.)

State Agency Medical and Psychological Consultants:

In April 2014, Rabah Boukehims, M.D., advised that there was insufficient evidence in the

file at that time to evaluate the claim. (Tr. at 88.) A few months later, on September 17, 2014, after receiving additional evidence, A. Rafael Gomez, M.D. opined that Claimant had no exertional limitations; could frequently climb ramps/stairs, balance, stoop, kneel, and crouch; occasionally crawl; never climb ladders, ropes, or scaffolds; and should avoid concentrated exposure to extreme cold, vibration, fumes, odors, dusts, gases, poor ventilation, and hazards, such as machinery and heights. (Tr. at 101-102.)

On October 23, 2014, Ann Logan, Ph.D. opined that Claimant had a mild restriction of activities of daily living, mild difficulties in social functioning, mild difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation, each of extended duration. (Tr. at 99.) She therefore found Claimant mental impairments to be not severe. (Tr. at 99-100.)

**The Administrative Hearing**

Claimant Testimony:

Since her stroke, Claimant testified that her memory is totally different and that she can no longer remember what she is doing at the time. (Tr. at 68.) She also stated that she lost her ability to be independent and must have someone with her at all times. (Tr. at 69.) She has forgotten to turn off the stove or running the water in the bathtub. (Id.) Besides memory loss, Claimant also suffers from migraine headaches from the stroke, for which she takes Advil. (Tr. at 70.)

Claimant testified that she has seizures every six months, and her most recent seizure was three to six months before the hearing. (Tr. at 69.) Because of her seizures, her neurologist has instructed her not to drive. (Id.)

After her Whipple procedure, Claimant stated that she was hospitalized for a month with sepsis, but since that resolved, she has about twenty bowel movements a day, and that it is

uncontrollable. (Tr. at 71.) Also at the time she had the Whipple procedure, Claimant suffered from a blood clot in her leg, although it resolved from her taking Coumadin; she no longer has to take Coumadin. (Tr. at 72.) She still has swelling in that leg, but not as much, though she has to elevate it for about two hours daily. (Id.)

Claimant testified that her husband reminds her to take her medicine, and that sometimes she has trouble following the plot on television shows. (Tr. at 72-73.)

Patricia B. Posey, Vocational Expert ("VE") Testimony:

The VE classified Claimant's past work as a hospital cook having a medium exertional level with a specific vocational preparation (SVP) level of 6. (Tr. at 75.) The ALJ provided a hypothetical question to the VE comprised of the limitations provided in the controlling RFC, except that the individual would be off task five percent of the time in an eight-hour workday. (Tr. at 77-78.) The VE testified that such an individual could not perform Claimant's past work, but could perform the unskilled jobs of laundry worker, cleaner, and sorter. (Tr. at 78-79.) The ALJ further provided additional limitation, asking if an individual would be able to perform work if she were off task ten percent of the day and absent two days per month, and the VE testified that such an individual could not. (Tr. at 80.)

Claimant's attorney then asked about how the jobs would be impacted if a hypothetical person would need to be within close proximity to a bathroom. (Id.) The VE responded that this limitation went to the amount of time being away from task, although if the individual needed to be within close proximity to a bathroom works with food, this would not be an appropriate job category because food service workers have to attend more carefully to cleanliness, and this would certainly concern a supervisor. (Tr. at 80, 81.) The VE explained that if the individual was off-task

16

more than fifteen percent of the time, then the individual would be unable to sustain gainful activity. (Tr. at 80-81.) The VE also testified that if the individual needed to elevate her legs for a period of time throughout the workday, such as an hour in addition to regularly scheduled breaks, then the individual could not sustain gainful activity. (Tr. at 81.)

**Scope of Review**

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence, however, the Court determines if the final decision of the Commissioner is based upon an appropriate application of the law. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Further, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." Blalock, 483 F.2d at 775.

**Analysis**

As stated above, the primary argument here is whether the ALJ's finding that Claimant had a fifteen percent off task limitation, as accommodated by the RFC assessment, is supported by

17

substantial evidence.

Claimant has referenced two cases in other districts that have addressed this argument. In Lanigan v. Berryhill, the Seventh Circuit found that the ALJ therein provided no foundation for the hypothetical to the vocational expert that the claimant would be off task up to 10% of the workday. 865 F.3d at 563. In that case, there was no explanation for how the ALJ came up with the 10% figure, and also, the ALJ did not explain his conclusion as to why the claimant would not have been off task more than 10% of the workday, given his unrebutted testimony that he took unscheduled breaks several times during his five hour shift. Id. A similar result was reached in Olivarez v. Colvin, 2015 WL 1506084 (W.D. Wisc., April 1, 2015), where the ALJ did not explain how he arrived at the finding that the claimant would be off task 5% of the day.

In this case, there is no explicit explanation for the 15% off task limitation as provided by the RFC. As demonstrated by Claimant, the only direct reference to the 15% off task limitation comes from the colloquy between Claimant's attorney and the vocational expert:

Q:    Ms. Posey, if the – regarding the jobs you listed which would be the first hypothetical, the short order cook, automotive detailer, and laundry worker, and then the additional medium and light jobs you listed in the further hypotheticals, if the hypothetical person needed to be within close proximity to a bathroom in the workstation, would that be allowed in all those jobs?

A:    It would be allowed. Well, I think if an individual who works with food has to be away from the worksite for bathroom purposes frequently, I don't believe that one would be one we could – would be appropriate. And again, the only – the amount of being away from task is percentage drop in ability to attend to task and if it's above 15 percent, it would be my opinion, the individual could not sustain gainful activity.

(Tr. at 80-81.)

The ALJ then asked the vocational expert to clarify the significance of the time being off task:

> Q:    I want to make sure I understood. With regard to the question about the
>        bathroom, you were talking about the time being off task is significant. But
>        did you say under any circumstances, you don't think the food service
>        worker would be appropriate? Or did I misunderstand?
>
> A:    You did not misunderstand. It's my opinion that food service workers have
>        to attend more carefully to cleanliness and frequent trips to the bathroom
>        would certainly concern a supervisor.

(Tr. at 81.)

Claimant's attorney then addressed the number of bathroom breaks Claimant would need to be

considered in the ALJ's hypothetical off task limitation:

> Your Honor, just going back to the question asked about the bathroom of the VE,
> asked about the proximity, but further the amount of bathroom breaks she would
> need would be, would be included in the off-task hypothetical which you had
> already posed, so I didn't ask further questions about leaving for bathroom breaks.
> But I'd just like to ask you to consider that in regards to off task that she would
> need to frequently leave the workstation for bathroom breaks and then elevating
> her legs would also pose a problem in the workplace.

(Id.)

During the administrative hearing, the ALJ posed several hypothetical questions to the

vocational expert. The third hypothetical included all the restrictions found in the controlling RFC,

*supra*, however, it included an additional limitation: that the individual would be off task five

percent in additional to normal breaks in a normal workday. (Tr. at 77-78.) Given those

considerations, the vocational expert opined that the individual could not perform Claimant's past

work, but could perform the jobs of a bundle clerk or laundry worker, cleaner or sorter. (Tr. at 78,

79.) However, the vocational expert testified that if the individual were to be off task ten percent

of the time, in addition to normal breaks in a normal workday, and be absent from work two days

a month, then the individual could not sustain gainful activity. (Tr. at 80.)

A claimant's RFC represents the *most* that the individual can do despite her limitations or restrictions. See Social Security Ruling 96-8p, 1996 WL 3744184, at *1 (emphasis in original). The Regulations provide that an ALJ must consider all relevant evidence as well as consider a claimant's ability to meet the physical, mental, sensory and other demands of any job; this assessment is used for the basis for determining the particular types of work a claimant may be able to do despite her impairments. 20 C.F.R. § 404.1545(a). The RFC determination is an issue reserved to the Commissioner. Id. § 404.1527(d).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physician's opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

Though "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision" Reid v. Comm'r of Soc. Sec., 769 F.3d 861, 865 (4th Cir. 2014) (quoting Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005) (*per curiam*)), it is necessary that an ALJ " 'must build an accurate and logical bridge from the evidence to his conclusion.' " Monroe v. Colvin, 826 F.3d 176, 189 (4th Cir. 2016) (quoting Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000)). The ALJ in this case did not provide a reason why he found Claimant would be off task up to fifteen percent of the workday in addition to normal breaks. This omission is important because the RFC assessment with respect to the fifteen percent off task behavior does not contain the necessary explanation that allows for meaningful judicial review. Mascio v. Colvin, 780 F.3d 632, 636 (4th Cir. 2015). It is further important to this case because Claimant's frequent daily bathroom breaks were clearly a significant component to her alleged disability given the hearing

testimonies. "In short, the ALJ 'failed to explain why he equated the facts to a [15%] reduction as opposed . . . to any other number'"; given that the vocational expert opined that in excess of being 15% off task precluded gainful activity, the ALJ needed to explain why Claimant was not so limited. See, Tucker v. Berryhill,[6] Civil No. TMD 16-580, 2017 WL 2719369, at *6 (D. Md., June 23, 2017) (quoting Lobbes v. Colvin, No. 4:13-cv-57-RLY-WGH, 2014 WL 1607617, at *20 (S.D. Ind. Apr. 22, 2014)); see also, White v. Commissioner, Social Security Administration, Civil No. SAG-16-2428, 2017 WL 1373236, at *2 (D. Md., April 13, 2017).[7]

The undersigned agrees with the Commissioner that when an adjudicator fails to list an additional impairment as severe at step two, it is not reversible error if the adjudicator finds at least one other severe impairment and continues with the remaining steps in the sequential evaluation process. Miller v. Colvin, No. 2:13-cv-31251, 2015 WL 917772, at *11 (S.D.W. Va. Mar. 3, 2015); Ashby v. Colvin, 2015 WL 1481625, at *9 (S.D.W. Va. Mar. 31, 2015). Indeed, the ALJ herein found Claimant's symptoms related to her post-surgical pancreatitis treatment "non-severe" and noted her testimony that she had "at least 20 bowel movements daily" as well as the treatment

---

[6] In that case, the ALJ found the claimant would be "off task up to 5% of the workday because of problems with concentration and focus", but did not explain how he came up with this number, or articulate which facts allowed him to come to that conclusion. Id. Therefore, the court reversed the Commissioner's final decision, in part, on that particular issue.

[7] While the undersigned appreciates the Commissioner's contention that the ALJ provided a review of the medical and other evidence of record in support of his decision, unlike the ALJs in the case law referenced in the Commissioner's brief, the ALJ herein did not express the reasons for the off task percentage. In Hayslett v. Colvin, No. 7:14-cv-631, 2016 WL 1254607 (W.D. Va. Feb. 12, 2016), adopted by 2016 WL 1296080, at *8 (W.D. Va. March 30, 2016), the ALJ found the claimant would be off task 10% of the workday " 'to deal with [] depression, fatigue, and pain.' " The ALJ buttressed this finding not only with the review of the medical and other evidence of record, but also in the RFC assessment and hypothetical questions to the vocational expert that the claimant's "concentration and focus problems [] would cause her to be off task 10 percent of the workday, which relate to her ability to stay on task." Id. Likewise, in Fisher v. Colvin, No. CIV. TMD 14-1011, 2015 WL 5287120, at *8-9 (D. Md. Sept. 9, 2015), the ALJ explicitly found the claimant would be off task 5% of the work day "due to concentration and focus problems", and supplemented this finding with an explanation within the written decision that the claimant had moderate difficulties in maintaining concentration, persistence, or pace that impacted her ability to stay on task, which also comprised the hypothetical to the vocational expert. Further, the court found that the claimant pointed to no other evidence that cause a greater limitation than found by the ALJ. Id. at *8. In short, those distinguishing characteristics between those cases and the one at bar provided the information necessary for meaningful review.

records in which she reported having "five to six bowel movements daily." (Tr. at 50, 539-547, 811-828.) Additionally, the ALJ also found that Claimant's difficulties with concentration, persistence or pace were mild, and that despite her complaints of memory and concentration issues, psychological testing revealed unremarkable findings. (Tr. at 50, 52, 54.) Nevertheless, although the ALJ acknowledged Claimant's assertions that she had memory, concentration, and bathroom issues, because this Court is "left to guess about how the ALJ arrived at his conclusions" that Claimant will be off task 15 percent of the time in an eight-hour workday, remand is in order. Mascio, 780 F.3d at 637.

In sum, the undersigned **FINDS** that the ALJ's failure to articulate what evidence supported his conclusion that Claimant will be off task fifteen percent during the workday does not comport with the Regulations requirements for RFC assessments, and is unsupported by substantial evidence.

**Recommendations for Disposition**

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **GRANT** the Claimant's request for judgment on the pleadings (Document No. 11.), **DENY** the Defendant's request to affirm the decision below (Document No. 12.), **REVERSE** the final decision of the Commissioner, and **REMAND** this matter back to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further administrative proceedings in order to correct the error noted above.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Irene C. Berger, United States District

Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Berger, and this Magistrate Judge.

The Clerk of this Court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: April 11, 2018.

Omar J. Aboulhosn
United States Magistrate Judge